Good morning, Your Honors. My name is Patrick Walensky. I represent Satterfield & Ponticus Insurance Company, Construction Company, and Amerisher Insurance Company. May it please the Court. I don't see them very often, but this seems to be a case of first impression. And it's whether funds obtained by a contractor through alternative risk transfer means, in this case, a settlement based on indemnity provisions rather than insurance, whether an excess carrier can allocate between covered and non-covered damages in that settlement based on the terms of their excess policy. So basically, U.S. Fires wanted to go back and pick apart that settlement. Real life, what does this amount to? It amounts to excess. I mean, they want to make sure they're excess. They want to make sure the primary is primary. So I don't see a problem with that. That's correct, Your Honor. But in this case, under the terms of the policy itself, this subcontractor — subcontractor settlements based on indemnity are not insurance under the policy. So the — so the U.S. Fire policy is not excess of them. And I can explain that. I did — I have a handout, a visual aid. I'll start with a simple question. I want you to get your handout. Okay. Do you dispute that you have a duty here to segregate between covered and uncovered losses? In — as far as the subcontractor settlements, we do. We dispute that, Your Honor. That has been S&P's — that's been S&P's position since day one when the judgment was entered. In fact, it's been its position based on the fact of why it has an indemnity clause in its subcontract. And the basic reason for that, it's belt and suspenders. They require their subs to provide additional insured coverage, which names S&P as an insured on that policy, but all of the 16 subs and suppliers that were involved denied. And they probably had 16 different reasons based upon the types of endorsements you see. So that's why, in construction, you have a situation where the contractor will also rely on indemnity. And the indemnity is not insured — it's not insured for S&P. The indemnity is insured for the subcontractors. The subcontractors have insurance for that indemnity, or they may not have insurance for that indemnity. But that's not any insurance that inures to the benefit of S&P. So what happened here is we had a — there was an arbitration for — and there was an award for $8 million. Before the award was entered, we — S&P settled with all the subcontractors for $4.492 million, which looks like a really good thing and was a very good result at that time. So once the award came down, S&P relied on that $4.4 million — that $4.5 million to satisfy the first amount of the judgment. And because the damages that were settled are not covered, as admitted by U.S. Fire itself throughout this proceeding, that $2.8 million for mold damages and $1.5 million for the attorney's fees award, they're just not covered under its policy. If the settlement money undisputedly had only gone for losses that were covered and then that had fully compensated them for those losses, you wouldn't be saying that U.S. Fire still would have to be — pay, is that right? U.S. Fire would still be paying — they'd be paying the same amount, Your Honor, because we — Double payment for the same loss? No, it's not double payment, Your Honor, because remember here that $4.5 million settlement was not for insurance. It was for — Would you say that — It was for uninsurable risks, Your Honor. If the settlement money undisputedly went to losses that were covered by Fire, you wouldn't claim that Fire would have to still pay on the insurance policy, would you? Yes, we would, Your Honor, because what would happen is it would go up — it would go up from the — well, I don't know how the number's in front of me, but it would go through the primary layer. Then it would — we would have — and then I guess there would be a — there'd be a — there'd be — the other insurance issues would enter into the — into the equation, and they would have to divide the excess — they'd have to divide the other insurance to decide which is excess, which is primary, as they did in the R.S.R. case, Your Honor, which is excess, which is primary. And then it would still go up, and I'm — and U.S. Fire would still end up paying a portion of the loss, because once — after there's $4.5 million paid, there's still $3.5 million of an $8 million judgment that's — that's there. You must — I must be oversimplifying it to think that R.S.R. sort of builds on — was it Judge Garwood in that case? Was Judge — was that Garwood? Yes, yes. And he made the eerie guess based on Ellender, correct? Yes, Your Honor. This law says, presumptively, we'll allocate them to covered losses unless you, the insured, segregate. That's the rule of thumb. Right. So to avoid that here, what's crucial for you is the policy term that this indemnity agreement isn't other insurance? Is that the position you're taking? Or is that oversimplifying? It may be, but it's not the way we avoid it, Your Honor. It's the fact that R.S.R. involved settlements with insurers, okay? And those were apples and apples. This involves indemnity settlements with insurance, and that's apples to oranges is the problem there. And — But if the term other insurance then embraces any legal mechanism relating to liability, that would just seem to be very broad language. That's what — But that's not what the policy says, Your Honor. Read to me exactly what that — I gave you a visual aid, but what it says is other insurance means, and if you look at sub 2, any type of self-insurance not involved here, or other mechanism by which an insured arranges for funding of legal liabilities for which this policy also provides coverage. And the — That's subcontractor indemnity agreements. It's not that, because the last clause says it has to be legal liabilities for which the policy also provides coverage. This policy did not provide coverage for — Well, it didn't provide — yeah, it didn't provide coverage for mold or attorney's fees. But isn't that the same allocation problem? In order to give meaning to that, you would have had to have said what the policy — what losses are attributable to which one. You have to divvy up the money. Well, Your Honor, what happened here is, when we say that we settled — that S&P settled with all of the subcontractors, that involved a long process. That involved 16 different entities with different — with different agendas, and none of them — none of them would agree to any type of allocation or any type of more specific — any more specific type of language in the policy, other than they supplied labor and materials to the courthouse that was — it was alleged to be defective, and they're paying X amount of dollars in connection with work on the — with the defective work on the courthouse. But it makes us all say that U.S. Fire has even less control about how to structure those settlements. It's a party control principle, right? Yes, it is a control principle. The difference between this case and if you look at R.S.R., there were two separate — totally separate lawsuits, is this settlement was made in the context of an arbitration, an arbitration in which the defense counsel was fastidious in keeping the excess carrier involved. They reported to the primary carriers, which were Aglec, a Zurich entity, and Amerishore, and the — and U.S. Fire. U.S. Fire had the — they were — provided copies of the settlement agreements. That is a distinction, but they still never had control over the confection of the settlement. I think, Your Honor, it had — had — what happened is they chose not to do that. All they did is they responded and said, we will honor reasonable settlements. They had an opportunity to do that, and they didn't take it. And so how is that punishing them like — like Ellender? That's — that's our point on that issue. So we think that — that in this — in this case, we did have the type of — the type of settlement and we had — that the excess carrier could have and had every opportunity to — to participate, but they — they stood on the sidelines and didn't do nothing, and now they claim that they just didn't have an opportunity. One — there's one other issue. I mean, the — the district court also had several statements in its — in its — in its opinion, and one was that S&P chose not to ensure a substantial portion of the risk it carried as the general contractor for this large construction project. That just doesn't accord with the reality. The reality is it did carry insurance. It had primary insurance, and it had $25 million of insurance from U.S. FIRE. And to bootstrap that up, they had indemnity obligations from their subs — indemnity obligations that proved to be very valuable. They ended up insuring more than half of the — or the indemnity obligations didn't exclude mold or attorney's fees? No, Your Honor. They basically said at the — the last sentence says that these obligations apply whether or not you have complied with any insurance requirements or you have insurance. And that's a fact of life in the construction business between general contractors and — and subs. So — There aren't too many situations like this. Pardon me, Your Honor? There aren't too many situations like this. You know, you'd think — well, to be honest, I think what happens is these cases get settled before they'll go to an arbitration or they'll go to the local jury where the building is — where the project was actually constructed. That's — Or they'll argue before the circuit court and go settle. Yeah. Yeah. They don't get here very — very often, Your Honor. So there's really no issue. The — the double recovery cases and one satisfactions, they just — S&P paid $440,000 of its own money, and two of its — its two primary carriers, Aglet, paid an extra 700 — an extra $739,000. And Amerisher, who's trying to recover it back, paid another $900,000. And I don't see under those circumstances how we can have — how there can be a — there can be a double recovery or a windfall, especially where U.S. Fire admits that the major part — just about all of the subcontractor settlements are uncovered. The only issue is that you can't — there's no way to allocate between the subcontractors — among the subcontractors — for how much actual work they paid for that was covered and what was not going to deal with in settlements. We had a very, very aggressive plaintiff's lawyer, and the plaintiff's lawyer that probably has six or seven more of these lawsuits on file, ongoing, two against others of my clients. And the subcontractors and their insurance companies are very, very hesitant to really to commit to any — any of the basis for what they're paying the money for. They're paying their money for freedoms, what they're paying for, to get out of these cases. And fortunately for S&P, they were able to enter into this settlement before the arbitration. And they had — they did have this pot of money, if you will, that it allocated that was allocable to the judgment. It certainly was not allocable to margaritas in Mexico or bonuses for the bosses, as was implicated in some of the briefing below. Even — for some reason, even Judge Rosenthal thought that somehow, by some — I think it was accounting trickery that S&P was getting away with something. We view it as S&P was a conscientious contractor. They made a very favorable settlement, and that settlement carried through. And if I ran the numbers, we may be — might be able to show that how it benefited U.S. Fire. So, Satterfield didn't have control of the settlements. There were 16 — they were the general, yes. They were seeking money. But they just did not have control to force these subcontractors and whoever — most likely their insurance companies who were paying — who would be paying for the settlement to allocate between covered and non-covered losses. That's just an issue that simply doesn't happen. Excuse me, Your Honor? It seems like you could have put that in the settlement agreement. If you put it in the settlement agreement, I would think that — how hard — how hard these settlements are to negotiate. I can't represent that we tried to do that. I don't think we did. But if we tried, it wouldn't have been successful. And my time is up, Your Honor. Thank you. Good morning. May it please the Court. My name is Kevin Risley here on behalf of U.S. Fire. Mr. Winsky stole my thunder a little bit, because I was going to start with Judge Wildensaw's statement, because I think she described this case perfectly. When she said that S&P chose not to insure a substantial portion of the risk it carried as a general contractor for a large construction project. And that's what this case is about. We submitted to the clerk's system — it's been distributed — a two-page handout that's a summary of the award and the payments. And it's really two pages or two ways of saying the same thing. On the first page, what we did is take the total arbitration award of the $8 million and break it down to the covered and uncovered losses, meaning covered under the U.S. Fire policy, not covered. There's no dispute that 4.3 of that was not covered. S&P was able to recover from the waterproofing contractor $1.75 million, which means their net Now, for the covered loss of $3.763 million, they had their primary insurance limit of $1 million, they had the supplemental payments of interest and administrative costs for the arbitration, and the payments to their subcontractors, which comes to $261,000 more than the covered loss. So the first thing that tells me is Mr. Winsky's client should be thanking him. They should be at $2.5 million. They're in front of this Court saying they're at $0.5 million. He put them way ahead of where they ought to be. Roberts. Do you agree with his statement at the end, factually, that the majority or all of the settlements were for uncovered losses? Absolutely not. And that was a big issue in front of Judge Ronstadl. We had the hearing on January 4th of 2017. One of the insurers, I think it was Marisher, said that there may be more settlements for uncovered losses, like maybe the wallpaper subcontractor helped cause the mold damage. And she said, well, I'll give you a chance to prove that. And they never did. There's never been any proof of any kind that any of these should be allocated anywhere other than covered losses. In fact, we've been able to do that. You didn't require that these settlements be allocated. Pardon? Your client required that they allocate when they approved these settlements. Well, we didn't approve these settlements. We did not object to the amount of the settlement. We didn't see the terms until afterwards. And because it's an excess carrier, we don't have the right to intervene in the settlement process until the primary carrier is exhausted. Our obligation to respond doesn't attach until there's exhaustion of the primary layer. Were these settlements by you? There was an implication that that's what happened. I think they ran the amounts by us, but they didn't show us settlement agreements at the time. And, in fact, they admitted on page 41 of their opening brief that they didn't tell us how they were going to allocate the settlements until after the arbitration work came in, which was long after most of the settlements had been done. So and Judge Rosenthal addressed this very well at the January 4th hearing. While we consented to the amounts and still have no objection to the amounts of the settlements, we never asked to and never agreed that they could use that any way they wanted. They didn't tell us they were going to do that. Now, I think that same page one of that chart, let's just make an example here that goes to some of the questions the Court was asking. Assume that S&P had had only uncovered losses, and they didn't get compensated for all those, but certainly U.S. Fire has no obligation to pay those uncovered losses. Assume the opposite. They had only covered losses, the Terrazzo, all that other stuff that got paid. They were overcompensated for that. So we have zero ununcovered, zero uncovered. But S&P says, put those together, all of a sudden we owe another $2 million. Math doesn't work out that way. He talked about Belkin's suspended risk transfer. But what they did was transfer some risks twice. Again, I'll use the Terrazzo Florii, who had nothing to do with the mold. The Terrazzo, some contractors work, they were obligated to pay under the indemnity provision of the contract. We were obligated to pay because it was a covered loss under the policy. But once that contractor pays for it, they can't say, okay, then we're going to take your insurance policy that covered Terrazzo and use it to pay mold or attorney's fees. That was always outside the risk. I'm not sure that I really understand their other insurance loss. We're not saying those were other insurance. The question is, have they already been compensated for the loss that wouldn't be covered under our policy? And the answer is clearly yes on that. And let me use another example here. Let's suppose that instead of 15 some contractors who contributed for the covered losses, there was only one. And that subcontractor, being a great guy, comes up to S&P after the arbitration award and says, you know what? We're sorry. We caused that loss. Here's your however many million dollars. Now, whether it was voluntary or through the indemnity agreement shouldn't matter. The point is S&P has been paid for the Terrazzo loss. They can't then come to us and say, now you pay for the Terrazzo loss. That's exactly the double recovery that they're asking to do. Were there any settlements that did describe? I thought there was one related to Mould where your client said that one we wouldn't count. We said that one we wouldn't count against our covered loss because, trying to be consistent, if we're not going to pay for uncovered losses, we shouldn't get the benefit of settlements for uncovered losses. And that's the one settlement where it was demarcated? Well, actually, it's kind of funny. It really wasn't demarcated. We took what we thought was a common-sense approach. In fact, Judge Rosenthal figures in her opinion or at the hearing said if we hadn't conceded on that, she might not have considered that to be an amount that should have been covered losses because it comes back to the RSR case. It's their burden to allocate. They tried to distinguish RSR saying that that involved insurance companies, not subs, and that involved an insurer that had no, was completely distant from instead of day-to-day involvement in. Well, now, I heard Mr. Walensky say that his client, S&P, who was a party to the settlements, had no control over them. Well, if they didn't, we sure didn't. Whatever control they had, we had less. And Judge Rosenthal pointed that out. So it doesn't matter that it's an indemnity payment as opposed to an insurance payment. The fact is, it's payment for the same loss they want us to pay for. Well, we'll take that back. It's payment for the same loss we agreed to pay for. They now want us to pay for a different loss. But if you put aside the case law, if we're just looking at the four corners of the policy, the other insured portion does say it has to be covered by your policy. That doesn't. But you need to go to the subrogation provision in the policy, which is titled go ahead. I'm trying to find it. I've got it here somewhere. I won't say it's page 3733 of the record. And that says, it's a provision called transfer of rights of recovery against others to us. In subrogation, what it says is, if the insured has rights to recover, all or part of any payment we have made under this policy, those rights are transferred to us. The insured must do nothing after loss to impair these rights or to transfer these rights to us. Now, when they settled, they released the subcontractors. So if we are forced to pay, we cannot go back against the subcontractors to recover it, because those rights have been released. So they have impaired our subrogation rights, which in this case were pretty valuable because we see how much money they were willing to pay. That's a breach of the contract itself, which would preclude them from recovery. But while they're right, it doesn't say the subcontractor treatments aren't treated by the other insurance clause. I agree with that. They are impacted by the subrogation clause, because that's our right to be made whole against the tortfeasor. In this case, they already got the tortfeasor, the wrongdoer, to pay for it and destroyed our right to go after them. Roberts. You're speaking quickly. I'm sorry. Well, no. You know well. When you just said you agree with them, what do you agree with? I agree with them that the settlement payments are not a mechanism under the other insurance. I agree with them that the settlement payments are not other insurance. Okay. I would have thought otherwise, but go ahead. I don't think it's necessary, because it doesn't matter whether it's other insurance or indemnity or voluntary payment. The question is, all right, this subcontractor caused this particular damage. Is that a covered loss? Yes. Has S&P already been compensated for it? Yes. And it turns out when you add all those together with their primary insurance payment and their supplemental payments, the amount they got is more than a quarter million dollars more than the risk we agreed to protect. You're saying your subrogation clause entitles you to the benefit of these indemnity policies that were paid, but then they were released, so — I'm saying something slightly different, that if we don't get the benefit of them because of the releases, they have breached the contract by violating our subrogation rights. So Section 2 would apply, that it would be a policy that would provide coverage because you would have coverage under the subrogation agreement? Well, I hate to be too picky here, but we would get the — Well, my obligation is don't worry about other insurance. Don't forget about that. Go straight to the indemnity clause, or subrogation clause. And we would have rights if they had not gone to the subcontractors. Is that — is that what Judge Rosenthal did or not? I don't think she used that exact analysis, but she did. She went on, you should get the benefit of those because it's for your covered losses. And when you do that, she agrees our math is right. I think the subrogation clause is a way to back that up, because if you don't give us the benefit of those payments, and you release the subcontractors, they've altered the risk analysis they agreed to with us. This is affirming on another ground, is what you're saying. Yeah. You could. But I think it's the same principle, that it's the basic concept of covered versus uncovered losses and the duty to segregate. That completely goes away under S&P's theory. So they're trying to rewrite a long history of Texas law, not just RSR, but this Court, even back in the Insurch v. Shan-Moran case, which is 952 F. 2nd, 1485, 1992, said we cannot allow an insured to settle against — or settle allegations against it, some of which might be covered by its insurance, some of which might not — for its policy limits, and then seek full indemnification from an insurer when some of the settled liability may be for acts clearly excluded by the policy. And that's what's happening here. They have settled for some liability that is covered by the policy, some that isn't, and they still want us to identify them so they get paid for losses that weren't covered by the insurance. So I got through more quickly than I thought. Give me just a second here. I think that the approach Judge Rosenthal took is consistent with three basic principles of Texas insurance law. Number one, an insured does not pay for covered losses. Number two, the insured has an obligation to allocate between covered and uncovered losses, and if they don't allocate, it's presumptively all for covered payments. That's clear under RSR. Number three, it's consistent with the right that we have under our policy of segregation rights that are taken away when they settle and release the subcontractors. If they had not released the subcontractors, we'd be in a different position, because we would not have been damaged. But the release of the subcontractors takes rights away from us. Do you need all three or can — or the first two independent of the third? You can do the first two. You can do all three. You can do any one of them. I mean, you can throw in some other reasons. I came up with a list one day of six different reasons that are inconsistent. But I think we've talked about the most important one. So let me finish with another part of Judge Rosenthal's opinion. Just after she recognized that S&P had chosen not to insure the risks, she said, Now, after it had suffered an adverse judgment that encompassed both covered and uncovered risks, S&P seeks to leave its insurers on the hook for risks they did not agree to insure. This theory is not only lacking in case support, it would produce an unfair result. Whether she got it right in the court of appeals or the district court should be affirmed. Thank you. Buttle argument. Just a couple of points, Your Honors. First thing, on the subrogation issue, I think recent Texas law has basically said that when the insurance company has an opportunity to participate in a settlement and they don't, that the insured can go ahead and settle. The Shan-Morahan case, you can't allow the insured to settle for some covered and some not covered damages. That's really under the same insured, same policy. Here again, we have something different. We have the subcontractors are settling under the, we're settling with subcontractors, and we're not settling with our own insurers on that. And again, I'm not going to belabor the other insurance issue again, but based on the way the policy reads, that's not insurance. And so I think there's a ton of cases cited by U.S. Fire in their brief about one satisfaction, other insurance, et cetera. And all of those cases are really talking about apples. That's insurance versus insurance. This is, again, apples versus oranges. So that's not the answer to the question. And as far as whether or which subcontractors settled for what, it still comes down to the fact that we couldn't get that allocation. It was not gotten, admittedly, because we couldn't. And all throughout this whole procedure, this long procedure, this case has been going on for quite a while, U.S. Fire has maintained that $4,300,000 just isn't covered. And when we put the indemnity clauses into our subcontracts, we realized that something's not going to be covered. And by that time, when these subcontractors were, or these subcontracts were entered into, we knew mold wasn't going to be covered under a CGL or an excess policy. Attorneys' fees, I think it's very questionable still under Texas law, that may be decided by this Court very soon, whether or not those are attorneys' fees awarded to a plaintiff, whether those are actually insured damages under a policy. But we took all that into account, and we still had a situation where we have a situation where we were able to recover based on the indemnity clauses in the subcontracts. And that's still the crux of this entire thing. Judge, I think this Court should reverse the granting of the summary judgment to U.S. Fire and render judgment in favor of Amerisher and S&P. Amerisher paid $900,000 it did not have to pay, because we didn't select their policy period even to cover this. We selected the AGLIC policy period, but because they're insured was in grave, dire straits on account of this judgment, they stepped up to the plate and made arrangements so that they could go after U.S. Fire after that. And that's what we're doing here, Your Honor. And we also ask, Your Honors, we also ask for attorneys' fees in pursuing this coverage from U.S. Fire. And if anyone else has any questions. Thank you, Counsel. Thank you very much. We'll call the last case for the day, 16-309.